All right, our fourth case for today is Wright v. Commissioner Saul, 2027-15. And Mr. Sutterfield, you seem to be here on the video, so I'm glad to see that. Let's wait just a minute to make sure that Mr. Mody – oh, there you are. So it looks like we've got everybody. So, Mr. Sutterfield, you may proceed. Thank you, Your Honor. May it please the Court and Counsel, the claimant went to her administrative lodgings sharing with the clear expectation that the medical evidence regarding her care and treatment of her back would be fairly considered by the judge. It was not. And that's the reason we're here today, because the judge's failure to do that undermines the totality of this decision, including his RFC determination and his credibility determination, which would – both of which encompass the assessment of the opinion evidence. The – where the biggest failing is, is with respect to the September 2015 MRI. That MRI demonstrated that there was a worsening of the disc and that also there is now prominent scar tissue. Dr. Rahman subsequently reviewed that MRI in December 2015. And if conservative care didn't work, then he opined that she was a surgical candidate. And she did, in fact, then have – and Dr. Islam also opined that she was probably – potentially a surgical candidate based on that same MRI. The ALJ then kind of puts a cap on that error by indicating that there is very little evidence between 2016 and early 2017 with regard to the Ms. Wright's back condition. I think what's remarkable is that when you read the judge's decision, she has the first surgery six weeks after her alleged onset date. And then her second surgery is 29 months later. And there is no way that you can fairly read that decision and understand how that occurred. There's no way that you can fairly read the state agency opinions and know how that occurred. And the only way you can do that is to go through the record and see, again, based on this MRI, she has a worsening of her condition. She complains to Dr. Thiel she's worse. She complains to her family doctor she's worse. And, again, she becomes a surgical candidate after she goes through her normal course of finding, treating, and proceeding forward. So let me just interject, though. Looking at the administrative law judge's opinion, from page 6 of 12 of that opinion, which is in the appendix at 30, apparently, he goes through quite a bit. He discusses lots of medical care. The ALJ doesn't need to touch base on every last sentence in the record. He does mention the September 9, 2015 MRI, some degenerative changes. But the ultimate question is, for people who have something wrong with them, and no one is saying that there's nothing here. Indeed, he finds that there are severe impairments. But can she still do work? What you need to focus on is the evidence in the record where she, you know, like I'll just pull out of the air. December 11, 2015, Dr. Chapa is doing this exam. She's got some weakness and numbness, but negative straight leg raise, no specific difficulty getting on and off the table. I mean, there's evidence that the glass is half full, I guess I'll say. Well, there is limited, also she has very limited motion. Her motion of her spine is one third at that exam. It's 30 degrees, not 90. So it's not, it's a little more than not half full, or glass half full, or anything like that. I think it's quite a bit more tip the other direction. You got to anticipate that, you know, again, if she's disabled, she's not out doing a whole bunch before she goes to see the doctor for the consultative exam. So he's seeing her when she's functioning at her best. So I would, I don't think that that in particular is noteworthy. It just isn't. What about this paragraph on page 8 of 12, where the administrative law judge essentially says she's, her statements about how bad her pain is don't correspond to the record. It says she claimed at the hearing that she spends the majority of her time during the day lying down and reclining. Medical providers hadn't talked with her about what might be causing such severe pain, but then the ALJ says it appears from the record, however, that the claimant has never reported such severe limitations to her providers, and goes on to say that she's been, you know, addressing these things with conservative measures, which is nothing wrong with that. Then he mentions somewhat resistant to medical interventions, resistant to this and that. I'm just saying if you can read the record both ways, the standard of review pushes us to accept what the ALJ said. Well, again, I would respectfully disagree. I think in terms of their, I don't have immediate sight for it, but there certainly is case law that says the fact that the records don't indicate that an individual needs to lie down or recline due to back pain doesn't mean the individual doesn't need to lie down or recline. They're going to see their doctor and explain, I'm having pain. I'm only sleeping, you know, three hours a night. She's taking powerful narcotics that are designed for severe pain. They stepped them down later in 2007 because... They did more than step them down later on. She wasn't using the narcotics anymore. In April of 17, they were stepping down from the hydromorphone. But later on, she had stopped using them. By the time of her hearing, she wasn't using the narcotics anymore. Sure, but the second surgery is 29 months after her alleged onset date. There's this chasm of, again, if you read the decision, there's no way that this ALJ illuminates the pathway by which she goes from surgery number one, complains that she's worse, has an MRI that shows that there is now a change for the worse in the pre-surgical MRI. Two doctors say, you know, if we fail conservative care, she's a candidate for surgery, which she then has. She certainly would be entitled to a closed period. But she's on severe medications throughout that entire time period. So, you know, medications for severe pain, I should say, during the entirety of that time period. So I think that's really important. I think when you look at the fact that, again, when she goes to pain clinic, Dr. Fancher, that's what he's going to work on is his scar tissue. Again, the fusion surgery is designed to treat the disc prominence that she now is enhanced. It's worse now in post-surgery than it was pre-surgery. So I think that ALJ is obligated to discuss those matters. As are the state agency doctors. If you look at the state agency doctors, they have that MRI all garbled up, too. They don't mention the disc. And when they reference the prominence of the, when they mentioned the scar tissue, they don't state it in a manner that's stated in the MRI report, which calls into question their, you know, despite the fact they're very early in the process, which calls into question reliability of their opinion because of the things they're completely unaware of. Namely, you're going to a pain clinic and ultimately having surgery. I think they're undermined. But these are not nitpicking things. Not when two doctors are saying these are matters that would be a basis for subsequent surgery. That would be why that's so important. Well, if you'd like to save a little rebuttal time, that would be fine. I'm going to go ahead and save rebuttal time. All right. Thank you very much. Mr. Mody. Thank you. C. Mody on behalf of Andrew Sell, Commissioner of Social Security. Your Honor, the ALJ's non-disability finding should be affirmed because it rested on medical evidence and medical opinion evidence that reflected the claim it could, at the least, perform a range of light work, despite receiving surgical and other treatment for her severe spinal impairment. Turning first to the objective medical evidence, as the ALJ's decision highlights, the record paints a fairly consistent picture that even after undergoing a spinal decompression procedure in May 2015 that didn't fully alleviate her symptoms, physical examinations performed throughout the relevant adjudicatory period yielded relatively consistent findings about claimant's normal gait and normal neurological functioning. And beyond the stable baseline condition, this was supplemented by claimant's improvement after her 2017 fusion procedure, after which claimant reported that her preoperative symptoms had resolved, that she was doing well, and her doctor had cleared her to return to her regular activities as tolerated. So, Mr. Mody, I can't resist asking you. I take it the Commissioner is not making anything of these little hints in the record that she was somehow, I don't know, non-compliant or that she had problems with her relationship with her first doctor. We can just set that to one side as noise. Well, Your Honor, I think that gets to the ALJ's discounting of the claimant's symptom testimony, which went largely unchallenged at both the district court level and on appeal, that the ALJ did highlight numerous inconsistencies in claimant's statements and actions. And as Your Honor pointed out, one such inconsistency was the termination of the doctor-patient relationship from Dr. Naur due to inconsistencies in the claimant's history. The ALJ had also noted another inconsistency in claimant's behavior during a visit with Dr. Naur, where the claimant stated that she was unable to move at all, and Dr. Naur noted that she was actually moving quite well during the examination. The ALJ highlighted other inconsistencies, such as during claimant's rheumatological consultation with Dr. Craddick in late 2015, where the claimant was resisting strength testing and was resisting so much that she was exerting more force than was actually being applied as part of the testing. Dr. Craddick also noted claimant's exaggerated pain responses, noted she was taking more narcotic medication that would be appropriate for a large man. Dr. Craddick noted that claimant should be weaned off narcotic medication, and Dr. Rockland in late 2015 seconded that concern and noted that claimant's usage of pain medication, narcotic pain medication, was disproportionate to the amount of spinal dysfunction she actually had. So these are inconsistencies that we believe are important because they undergird the ALJ's non-disability finding here, that they are entirely consistent with the normal clinical findings obtained throughout the period, even after claimant's initially unsuccessful spinal fusion procedure. And I think the salience of the state agency reviewing physician's opinion and Dr. Thiel's opinion about claimant's ability to perform a range of light work are that they expressly contemplated the scenario that played out in this case, that they were aware that claimant's initial surgical procedure was not fully successful and that another fusion procedure in the future may be necessary, that she might require other treatments such as pain medication and epidural injections. But despite this awareness of the claimant's need for ongoing treatment, they still found that claimant could perform a range of light work at a minimum. And that was entirely consistent with the normal findings regarding claimant's gait and neurological functioning, which persisted throughout the period that was before the ALJ, and of course entirely consistent with claimant's documented improvement after the fusion procedure. Beyond the benign treatment evidence and the persuasive opinions of Dr. Thiel and the state agency reviewing physicians, the ALJ also highlighted other inconsistencies between claimant's statements and what the record actually shows. Did the ALJ ever cope with the fact that the two primary care physicians had thought that she would regularly miss a couple of days of work a month, which vocational experts, in my experience with these cases anyway, usually say would be preclusive of work. Employers can't just month in and month out tolerate that level of absenteeism. Yes, Your Honor. The ALJ did discuss and properly explain why he was discounting the opinions of Dr. Naur and Dr. Islam about claimant's alleged need for breaks. The ALJ noted that these opinions were inconsistent with claimant's benign clinical findings, as I mentioned earlier. They were inconsistent with claimant's documented improvement after her fusion procedure in 2017. They were contradicted by the opinion of Dr. Thiel, one of the treating neurosurgeons, who concluded that claimant could perform a range of light work without any breaks. And the ALJ also highlighted the other factors, such as, in the case of Dr. Islam, his limited familiarity with the claimant. And with Dr. Naur, there was also the issue of the fact that a year after she issued that opinion, that she had terminated that doctor-patient relationship, again, due to inconsistencies in her history. So the ALJ did sufficiently reject these opinions and endorsed claimant's alleged need for breaks. And there was substantial evidence underlying the ALJ's finding here. As we know- Mr. Modi, the ALJ did not seem to take into account the September 2015 MRI that did show that her condition had slightly worsened. Well, Your Honor, the ALJ doesn't specifically mention the scar tissue in the decision. That is correct. But the ALJ relied upon the opinion of the State Agency Reviewing Physicians, and the State Agency Reviewing Physicians report expressly mentions the scar tissue issue and still found the claimant could perform a range of light work despite that MRI finding and despite the ongoing need for treatment after the initially failed surgery. Dr. Thiel similarly was the ordering physician on that MRI, and he had that MRI report. And at no point did he alter his initial conclusion that claimant could perform work that involved lifting up to 30 pounds and avoided twisting or jarring, which, again, was entirely consistent with the ALJ's functional capacity finding. So do we get with that MRI any, I guess I want to say, objective measures? One thing to say that there's more scar tissue or there's been some degeneration, but that could mean just a little bit or it could mean quite a bit. Do we get an objective sense of how much worse off she was? And shouldn't the ALJ have inquired into that? Well, Your Honor, again, the ALJ did rely on opinion evidence that interpreted the MRI and still found that she could work. And so the ALJ did rely on expert review of that evidence in finding the claimant could still work. And I think, you know, I think my colleague has made a lot about this alleged scar tissue issue, but it's important to note that the subsequent MRIs taken in September 2016 and in May 2017 are devoid of any mention of this issue. There's no indication that there was any worsening of this issue. Instead, the physicians interpreting these scans stated that claimant's spinal condition remained stable from 2015 to 2016 to 2017, that there was no, that every scan says that it's basically unchanged from the prior scan. Is there any evidence that this additional scar tissue contributed to her pain in any way? Your Honor, I think there is. At this point, it's speculative. I think, I know my colleague maintains that it is a driving factor, but I think it's important to note that Dr. Rachman, who he had mentioned in 2015, saying that, you know, additional surgery may be noted, may be necessary. Dr. Rachman, after that MRI, still found the claimant, still believed the claimant was taking too much narcotic medication for the amount of spinal dysfunction she had. And that was in December 2015. And in ordering, in recommending ultimately the fusion procedure in the fall of 2017, there's no mention of the scar tissue issue. It's simply stating that claimant's symptoms are persisting, so they are electing to go with a fusion procedure, which, again, was always contemplated by Dr. Thiel and the state agency reviewing physicians when they still, when they initially concluded that the claimant could perform a range of light work. This procedure was always sort of in the cards. And the fact that it happened is still in no way undercuts their opinion because they still found that she could still work with the awareness of that fact that was out there. So I know my sort of time is running out. So I just want to emphasize that substantial evidence is a low evidentiary bar. And the stack of negative clinical findings regarding claimant's gait and neurological functioning, the stability of her condition throughout the relevant adjudicatory period, claimants demonstrated improvement after her fusion procedure, the persuasive opinions of the state agency reviewing physicians and Dr. Thiel, who acknowledged the claimant could work even with the awareness about her failed spinal procedure, and the unchallenged discounting of claimant's symptom testimony, the inconsistencies between her statements and actions and her extreme claims of disability, all of this ensured that the ALJ's non-disability finding cleared the substantial evidence threshold with ease. Claimant's disagreement with the ALJ's interpretation of the record is not a valid basis for reversal. Claimant does not identify any evidence that compels reversal. So we ask that you uphold the district court's order affirming the ALJ's decision in this case. Thank you, Your Honor. All right. Thank you, Mr. Mody. Anything further, Mr. Sutterfield? Yes, very briefly. On the inconsistencies, I think those are all irrelevant. On the medications, she's taken what Dr. Knauer prescribes for when it's reduced. She goes with a reduction. She doesn't fight it. With regard to moving quite well, again, Knauer is prescribing a pain medication. Knauer completed the functional capacity report, indicating that she would not be capable of performing sedentary work. To put it into context, what does that mean? Moving quite well, given her surgery, et cetera. With regard to Dr. Craddock, Dr. Craddock thought she might have a mental issue in terms of how she resisted. With the exaggerated response, again, there's case law in that, that that is not meaning the person's exaggerated. It's a medical term that simply means that it's more than anticipated, but doesn't mean the claimant, the patient is exaggerating. And then also the, again, I don't know how she was compliant with that. All of those issues are red herrings. They're not central to this case. Again, you read that decision. You cannot get from surgery one to surgery two. Logically, you can't get there. The ALJ has to explain that. That's why she's going to a hearing, is for someone to look at this evidence and look at it fairly. If you look at it. I think we'll have to leave it there, Mr. Sutterfield. We definitely have your point, which is in your briefs. Thanks to you. Thanks as well to Mr. Modi. The court will take the case under advisement. And our final two cases for today have been submitted on the briefs. So we will stand in recess.